**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**Western Division**

UNITED STATES OF AMERICA, *ex rel.*
[UNDER SEAL]

[UNDER SEAL]

[UNDER SEAL]

*Plaintiffs*,

v.

[UNDER SEAL]

[UNDER SEAL]

[UNDER SEAL]

[UNDER SEAL]

[UNDER SEAL]

[UNDER SEAL]

*Defendants*.

**Civil Action No.** 1:12CV887

**Complaint for Violations of the Federal False Claims Act, 31 U.S.C. §§ 3729 et seq.**

SPIEGEL, J.

**FILED UNDER SEAL**
**Pursuant to 31 U.S.C. §3730(b)(2)**

**Jury Trial Demanded**

FILED
JOHN P. HEHMAN
CLERK
2012 NOV 16 AM 10: 21

**CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**Western Division**

UNITED STATES OF AMERICA, *ex rel.*
SARA CURTIS-HICKS
918 Sleepy Hollow Dr.
Monroe, Ohio 45050

LEAH BRODERICK
2153 Sharon View Ct.
Lebanon, Ohio 45036

DEBBIE TURNER
3328 weaver road.
Batavia, Ohio 45103

*Plaintiffs*,

v.

EVERCARE HOSPICE, INC.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

COLLABORATIVE CARE HOLDINGS, LLC,
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

OPTUM HEALTH HOLDINGS, LLC
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

OPTUM, INC.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**Civil Action No.**

**Complaint for Violations of the Federal False Claims Act, 31 U.S.C. §§ 3729 et seq.**

**Filed under seal and *in camera* pursuant to 31 U.S.C. § 3730(b)(2)**

**Jury Trial Demanded**

FILED
JOHN P. HEHMAN
CLERK
2012 NOV 16 AM 10:21

**CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT**

UNITED HEALTHCARE SERVICES, INC.
100 South 5th Street, Suite 1075
Minneapolis, MN 55402

UNITEDHEALTH GROUP INCORPORATED
100 South 5th Street, Suite 1075
Minneapolis, MN 55402

*Defendants.*

## INTRODUCTION

1. This is a *qui tam* action brought by co-relators Sara Curtis-Hicks ("Curtis-Hicks" or "Co-Relator"), Leah Broderick ("Broderick" or "Co-Relator,") and Debbie Turner ("Turner" or "Co-Relator") (collectively "co-relators"), on their own behalf and on behalf of the United States of America ("United States") against Defendants Evercare Hospice, Inc. ("Evercare" or "Defendant,") Collaborative Care Holdings, LLC, Optum Health Holdings, LLC, Optum, Inc., United Healthcare Services, Inc., Unitedhealth Group Incorporated, (collectively "Defendants,") to recover damages, penalties, attorneys' fees and other relief owed to the United States and co-relators for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 et seq., ("FCA" or "False Claims Act").

2. In connection with the receipt of reimbursement from the United States Department of Health and Human Services ("HHS"), Centers for Medicare and Medicaid Services ("CMS"), Defendants committed fraud against the Medicare Program by (a) knowingly presenting, and causing to be presented to an officer and employee of the United States Government false and fraudulent claims for payment and approval; and (b) knowingly making, using, and causing to be made and used, false records and statements to get false and fraudulent claims paid and approved by the Government, in violation of31 U.S.C. §§ 3729(a)(l) and (2).

3. In brief, Defendants, who collectively are a private, for-profit hospice chain and its corporate parents, have defrauded the United States through a systemic pattern and practice of enrolling and re-certifying non-terminal patients, admitting patients without

mandatory consent and/or power of attorney designations, billing for continuous care when such care was neither reasonable nor necessary, and providing inadequate services and other violations of the Medicare Conditions of Participation.

## PARTIES

4. Co-relator Curtis-Hicks is a citizen of the United States of America and a resident of Monroe, Ohio. At all material times Curtis-Hicks was and is a registered nurse licensed in the State of Ohio, No. 318189, and she was employed by Defendant Evercare as a case manager in Evercare's Cincinnati's West team and after moving into a night on-call position covers Cincinnati's West and East teams, and has occasionally covered cases for the Dayton, Ohio office.

5. Co-relator Broderick is a citizen of the United States of America and a resident of Lebanon, Ohio. At all material times Broderick was and is a registered nurse licensed in the State of Ohio, No. 324951, and she was employed by Defendant Evercare as a case manager on Evercare's Cincinnati East team.

6. Co-relator Turner is a citizen of the United States of America and a resident of Batavia, Ohio. At all material times Turner was and is a registered nurse licensed in the State of Ohio, No. 316472, and she was employed by Defendant Evercare as a case manager on Evercare's Cincinnati East team.

7. Defendants are entities composing a chain of corporate ownership beginning with Evercare Hospice, Inc. d/b/a Evercare Hospice and Palliative Care, providers of in-home hospice care, and ending with Unitedhealth Group Incorporated, which is a company ranking among the world's largest publicly traded providers of health insurance.

Evercare is owned by Collaborative Care Holdings, LLC, which is owned by Optum Health Holdings, LLC, which is owned by Optum, Inc., which is owned by United Healthcare Services, Inc., which is owned by Unitedhealth Group Incorporated. Taken together, these are the "Defendants."

8. Evercare operates in 11 states and the vast majority of its patients use Medicare as their primary insurer.

**JURISDICTION AND VENUE**

9. This Court has subject matter jurisdiction over the claims alleged in this Complaint under 28 U.S.C. §§ 1331 (federal question), 1345 (United States as plaintiff), and 31 U.S.C. § 3732(a) (False Claims Act).

10. Defendant maintains a hospice office in Butler County located at 9050 Centre Pointe Drive, West Chester, OH 45069. Therefore, this Court has personal jurisdiction over the Defendants because they have systematic and continuous contacts in the Southern District of Ohio and 31 U.S.C. § 3732(a) specifically provides for nationwide service of process where the Defendant can be found, resides, transacts business or where any act proscribed by § 3729 occurs.

11. The Southern District of Ohio is the proper venue under 28 U.S.C. §§ 1391(b) and (c), and 31 U.S.C. § 3732(a), because Defendants can be found in and transact business within this District.

12. Upon information and belief, this Complaint is not based upon allegations or transactions that are the subject of a civil suit or an administrative civil money penalty proceeding in which the United States is already a party. 31 U.S.C. §3730(e)(3).

13. Upon further information and belief, there has been no "public disclosure" of the matters alleged herein and this action is not "based upon" any such disclosure, within the meaning of 31 U.S.C. §3730(e)(4)(A). Notwithstanding the foregoing, Co-relators are the "original source" of this information as defined by 31 U.S.C. §3730(e)(4)(B) of the False Claims Act, and as such, they are expressly excepted from the public disclosure bar.

## MEDICARE FRAUD ALLEGATIONS

### Fraudulent Admissions and Re-certifications

14. Evercare hospice can only provide care if it is reasonable and necessary, and upon admission the Medical Director must certify that the beneficiary's prognosis is for six (6) months or fewer. (42 CFR § 418.22(b)(1) and (2).) Nevertheless, a majority of Evercare's patients remain on care far beyond six (6) months.

15. Evercare's patient population regularly exceeds the 6-month prognosis. As an illustration, co-relators examined the October 9, 2012 roster of Evercare Cincinnati's 120-patient population, and the September 18, 2012 roster of Evercare's Dayton office which includes 59 patients. In Cincinnati 65 patients, or more than half, had been receiving services for seven months or more. Among those 65 patients, the average length of stay was 425 days. In Dayton, 21 patients, or 38 percent, had been receiving services for seven months or more. According solely to the October 9, 2012 Cincinnati roster of patients and the September 18, 2012 Dayton roster, those remaining on service beyond 210 days and still billing Medicare included:

a. Patient S.S., admitted March 30, 2009 (1,289 days),
b. Patient E.M, admitted August 9, 2009 (1,157 days),
c. Patient P.A.M., admitted February 24, 2010 (937 days),
d. Patient R.M., admitted April 26, 2010 (876 days),

e. Patient C.O., admitted May 21, 2010 (851 days),
f. Patient S.F., admitted June 23, 2012 (839 days),
g. Patient E.D., admitted July 1, 2010 (831 days),
h. Patient B.K., admitted September 3, 2010 (767 days),
i. Patient E.R., admitted October 5, 2010 (735 days),
j. Patient D.L., admitted October 6, 2010 (734 days),
k. Patient E.S., admitted October 15, 2010 (725 days),
l. Patient M.B., admitted October 16, 2010 (724 days),
m. Patient N.D., admitted October 22, 2010 (697 days),
n. Patient J.Z., admitted November 25, 2010 (684 days),
o. Patient R.M., admitted December 20, 2010 (659 days),
p. Patient D.H., admitted January 28, 2011(599 days),
q. Patient M.Y., admitted February 26, 2012 (591 days),
r. Patient J.H., admitted March 6, 2011 (583 days),
s. Patient R.M., admitted March 7, 2011 (582 days),
t. Patient L.F., admitted March 12, 2011 (577 days),
u. Patient R.H., admitted March 14, 2011 (575 days),
v. Patient H.H., admitted March 5, 2011 (563 days),
w. Patient J.E., admitted March 10, 2011 (558 days),
x. Patient I.B., admitted May 18, 2011 (510 days),
y. Patient S.M., admitted May 24, 2011 (504 days),
z. Patient W.D., admitted June 18, 2011 (479 days),
aa. Patient A.M., admitted June 24, 2011(473 days),
bb. Patient R.P., admitted July 6, 2011 (461 days),
cc. Patient M.X., admitted July 28, 2011 (431 days),
dd. Patient M.J., admitted July 28, 2011 (431 days)
ee. Patient P.M., admitted July 28, 2011 (431 days),
ff. Patient C.E.R., admitted August 1, 2011 (414 days),
gg. Patient E.H., admitted August 26, 2011 (410 days),
hh. Patient W.N., admitted September 6, 2011 (399 days),
ii. Patient J.R., admitted August 17, 2011 (398 days),
jj. Patient B.M., admitted August 18, 2011 (397 days),
kk. Patient C.N., admitted September 29, 2011 (396 days),
ll. Patient G.S., admitted September 13, 2011 (392 days),
mm. Patient M.D., admitted August 31, 2011 (384 days)
nn. Patient M.H., admitted September 28, 2011 (377 days),
oo. Patient C.R., admitted October 10, 2011 (362 days),
pp. Patient M.W., admitted October 25, 2011 (350 days),
qq. Patient H.W., admitted October 5, 2011 (349 days),
rr. Patient E.C., admitted October 13, 2011 (341 days),
ss. Patient G.C., admitted October 13, 2011 (340 days),
tt. Patient N.W., admitted October 19, 2011, (335 days),
uu. Patient W.S., admitted November 15, 2011 (329 days),
vv. Patient J.S., admitted December 5, 2011 (309 days),

ww. Patient J.W, admitted December 8, 2011 (306 days),
xx. Patient M.C., admitted December 27, 2011 (287 days),
yy. Patient D.G, admitted December 29, 2011 (285 days),
zz. Patient R.G, admitted December 30, 2011 (284 days),
aaa. Patient R.M,, admitted December 31, 2011 (283 days),
bbb. Patient S.K.,, admitted January 2, 2012 (281 days),
ccc. Patient L.O., admitted January 5, 2012 (278 days),
ddd. Patient M.H., admitted January 12, 2012 (271 days),
eee. Patient O.R., admitted January 12, 2012 (271 days),
fff. Patient R.C., admitted January 12, 2012 (271 days),
ggg. Patient F.B., admitted January 14, 2012 (269 days),
hhh. Patient M.P., admitted January 20, 2012 (263 days),
iii. Patient J.S., admitted January 6, 2012 (261 days),
jjj. Patient D.F., admitted January 23, 2012 (260 days),
kkk. Patient D.K., admitted January 23, 2012 (260 days),
lll. Patient I.H., admitted January 13, 2012 (249 days),
mmm. Patient M.B., admitted January 13, 2012 (249 days),
nnn. Patient R.B., admitted February 4, 2012 (248 days),
ooo. Patient H.G., admitted February 6, 2012 (246 days),
ppp. Patient R.W., admitted January 17, 2012 (245 days),
qqq. Patient S.M., admitted February 9, 2012 (243 days),
rrr. Patient T.O., admitted February 10, 2012 (242 days),
sss. Patient J.M., admitted February 15, 2012 (237 days),
ttt. Patient A.L., admitted February 21, 2012 (231 days),
uuu. Patient E.R., admitted February 24, 2012 (228 days),
vvv. Patient A.S., admitted February 28, 2012 (224 days),
www. Patient B.S., admitted February 28, 2012 (224 days),
xxx. Patient L.M., admitted February 28, 2012 (224 days),
yyy. Patient F.P., admitted February 29, 2012 (223 days),
zzz. Patient U.T., admitted February 8, 2012 (223 days),
aaaa. Patient F.P., admitted March 2, 2012 (221 days),
bbbb. Patient J.S., admitted February 15, 2012 (216 days),
cccc. Patient M.K., admitted March 8, 2012 (215 days), and
dddd. Patient H.C., admitted March 12, 2012 (211 days).

16. Under Medicare regulations, at the start of each period of hospice care, a physician must certify that the beneficiary is terminally ill and support the diagnosis with clinical information and documentation that support the diagnosis. (42 CFR § 418.22(b)(1) and (2)). Evercare's patient population is frequently admitted with vague, non-fatal illnesses.

As an illustration, co-relators examined the October 9, 2012 roster of Evercare's Cincinnati 120-patient roster. It included 81 patients, or 68 percent, who had "dementia," "failure to thrive," or "cerebral degeneration" as their diagnosis. The September 18, 2012 Dayton roster included 33 patients with those diagnoses. Difficulty speaking and swallowing are symptoms of legitimate diagnoses, but upon admission, Evercare patients often do not display these conditions. A list of reviewed patients who were admitted with a vague diagnosis, but displayed significantly higher functionality is as follows:

a. Patient E.M. was admitted with a primary diagnosis of dementia, which typically requires that a patient can speak only one to five words. Nevertheless, E.M.'s intake note clearly states that the patient could tell jokes upon admission.

b. Patient E.S. was admitted with dementia which requires a patient be unable to speak more than five words in a 24-hour period but E.S. was still able to verbalize short sentences, go outings with her family, and was able to walk upon admission.

c. Patient A.W. was admitted with dementia, which requires a patient be unable to speak more than five words in a 24-hour period, but patient can speak, walk with a walker, uses the bathroom independently, and feeds herself.

d. Patient B.K. has been on service more than two years each with dementia diagnoses, but has not declined significantly during that time.

e. Patient S.F. has been on service more than two years with a dementia diagnoses, but has not declined significantly during that time.

f. Patient G.M. admissions note indicates that the patient has difficulty swallowing, but co-relator has seen him eating an Arby's roast beef sandwich and curly fries.

17. Even when a specific, terminal, medical diagnosis is given, Evercare does not always comply with the Medicare hospice requirements. Co-relator Curtis-Hicks conducted a follow-up for the Patient C.D.'s admission visit. This patient was admitted with Kidney

Disease (ESRD). Her creatine level was either 3.4 or 3.6. According to admissions guidelines, Creatine must be greater than 8.0 to use this diagnosis.

18. Evercare's aggressive marketing campaigns target nursing homes in particular so that the company can receive reimbursements for patients' staff nurses unaffiliated with Evercare. As of the October 9, 2012 patient roster, 103 out of 120, or 86 percent of the Evercare census lived in a facility where day-to-day nursing care was already provided.

19. Evercare management told co-relators that if a patient is not clearly eligible for admission or re-certification the co-relators should speak with Evercare Clinical Services Manager Karen Roling, who will help adjust the wording to make the patient appear more appropriate for hospice services on paper.

20. Evercare management told co-relators that they were to accentuate terminal symptoms for patients and down-play signs of life-expectancy beyond six-months.

21. Evercare management frequently sends a second team to assess a patient if they are not admitted on the first try. For example:

    a. Patient B.A. was deemed ineligible by co-relator, a nurse practitioner, and a medical director. The following day, Suzanne Lewis and Mark Kuhner publicly "berated" Karen Roling, Clinical Services Manager, for not admitting the patient. The patient was re-referred and another nurse went out the following week to admit. The Medical Director on-call that day was Dr. Jeremy Bruce. He gave an admission order.

    b. Patient M.G. was evaluated for admission by co-relator Turner. She did a thorough evaluation and discussed the patient's history and current status with the Medical Director, Dr. Jeremy Bruce, who stated the patient was not appropriate for services. The following day, Evercare sent another nurse, Sarah Stanley, to do another evaluation. Stanley copied large portions of the second assessment directly from Turner's initial assessment. Even so, Dr. Bruce admitted the patient with a diagnosis of dementia the next day. Patient was discharged after one benefit period for extended prognosis.

c. Patient S.M. was evaluated twice by co-relator Curtis-Hicks and found to be inappropriate for hospice services both times. A few months later another case manager admitted the patient and she remains stable and on service as of this filing.

22. Evercare admits patients without following proper consent protocol by admitting patients without election papers, or with elections papers signed by a person who has not been formally designated power of attorney.

a. Patient L.K.: The office staff called co-relator Curtis-Hicks to inform her of an incoming admission and said the required consents had already been completed. The patient's guardian, Gary Lewis, is the husband of Evercare Executive Director, Suzanne Lewis. Curtis-Hicks expressed skepticism over the patient's appropriateness for hospice services. Nevertheless, when she met with Mr. Lewis, he instructed Curtis-Hicks to fill out the consents and put whatever date on them and he would sign them, indicating that the consents had not, in fact, been signed.

b. Patient A.B. was admitted without proper consent paperwork signed off on.

c. Patient W.F. was admitted, however, when co-relator Curtis-Hicks arrived at the facility to perform the in-take, there was no copy of a designated power of attorney paperwork and no copy of the consents at the facility in the patient's chart. The next day, Curtis-Hicks found out that Mark Kuhner, Director of Business Development, met with an attorney who signed the consents as an alternate power of attorney, even though there was never any paperwork to substantiate the power of attorney designation.

**Evercare Misuses "Continuous Care" Designation**

23. The "continuous care" designation earns a provider the highest Medicare reimbursement rates for hospice care. (42 C.F.R. § 418.302(b)(1)- (4) (2003)).

24. Evercare puts patients who do not meet the criteria on continuous care:

a. Patient G.S.: During her 425-day stay on hospice service, Evercare put patient on continuous care more than once even though she was not appropriate for escalated services.

b. Patient A.J.: Patient was put on continuous care -- which Medicare covers "only as necessary to maintain the terminally ill beneficiary" -- when she was inappropriate.

She was admitted July 1, 2011, and discharged a year later for extended prognosis July 6, 2012.

c. Patient C.N.: admitted has been on continuous care multiple times when the facility would not medicate him.

d. Patient D.H.: was placed on continuous care once when her husband was admitted to the hospital and could not care for her. This is not a valid reason, though it would be valid to have placed her on "respite care," which bills at a lower rate.

25. Evercare patients that require continuous care do not always receive it.

a. Patient M.J.K.: Patient's plan of care prescribed continuous care but there was insufficient staffing to fully provide it during her period of need.

b. Patient A.O.L.: Started on continuous care but there wasn't enough to cover her continuous care needs for the full span of her stay.

**<u>Evercare Admits Patients After Other Hospices Discharge Them</u>**

26. When a patient's life expectancy improves beyond a six-month horizon and they are reclassified as having an extended prognosis, a hospice will discharge the patient out of its care. (42 CFR § 418.21.) Evercare often admits patients even where another hospice had discharged a patient with an extended prognosis. For example:

a. Patient E.S. was evaluated for hospice care on August 16, 2012 by competitor Hospice of Cincinnati, which found him inappropriate for services at the time. Evercare admitted him on August 26, 2012, where he remains.

b. Patient B.A. was referred to Evercare after another hospice discharged her for extended prognosis.

c. Patient G.M. was admitted to Evercare after another hospice discharged him for extended prognosis.

d. Patient M.G. was admitted to Evercare after another hospice discharged him for extended prognosis.

## Damages

27. The damages to the government are estimated to be at least $78 million. The reason for this number is that there are approximately 17 Evercare offices in the country, each of which service approximately 60 patients at a time, for approximately 1,020 patients a day. If even just one percent of those patients are on improperly on continuous care over the month, the government is losing $19,518,133.38 a year to Evercare. Since the co-relators were hired by Evercare in 2009, that would total $78,072,533.51 in fraudulent billing.

28. To the extent Evercare is liable, all of the parents are liable too because Evercare acts as an agent of the parents, and Evercare's financials roll up into the parent companys.

## COUNT I
## Federal False Claims Act Claim pursuant to 31 U.S.C. § 3729 *et seq.*
## Intentionally Presenting Claims for Payment to the United States for Patients Who Did Not Qualify for Hospice Services

1. Co-Relators reassert and incorporate by reference all paragraphs set forth above as if restated herein.

2. Pursuant to 42 C.F.R § 418 generally and specifically sections 418.1; 418.20; 418.22; 418.25; 418.50; 418.54; 418.74; 418.200; 418.202; 418.301-311 Evercare must meet requirements for certification of patients for hospice care to qualify for payment from the federal government. Specifically, § 418.22 requires a medical certification of terminal illness by a physician and that the certification be accompanied by documentation to support a six-month prognosis.

3. Evercare admitted and continues to admit numerous patients to hospice care through Evercare's Cincinnati and Dayton, Ohio offices who did not meet the criteria for hospice admission because they did not have a terminal illness. For each of the representative patients described above and in exhibits attached to Relator's Disclosure Statement (which is incorporated herein), Evercare submitted claims and received payment from the United States of America through Medicare for hospice services provided to each patient despite the fact that each patient did not meet the requirements for hospice admission.
4. The United States of America has been damaged by all of the aforementioned an incorporated misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount. Evercare knowingly made false claims in the form of reimbursement bills to officials of the United States for the purpose of obtaining compensation.
5. Upon information and belief based upon the co-Relators' knowledge of Evercare's local and corporate practices, other Evercare offices beyond the Cincinnati and Dayton offices also follow the same practices of knowing non-compliance and false billing.
6. Upon information and belief based upon the co-Relators' knowledge of Evercare's local and corporate practices, Evercare's corporate offices are aware of the non-compliant practices and have not taken action to accomplish compliance which would substantially reduce corporate profits.

**COUNT II**
**Federal False Claims Act Claim pursuant to 31 U.S.C. § 3729 *et seq.***
**Presenting Claims for Payment to the U.S. Government for Unqualified Patients Admitted and Re-certified**

7. Co-Relators reassert and incorporate by reference all paragraphs set forth above as if restated herein.

8. In addition to, and often in conjunction with, its practice of admitting and billing the United States of America for Hospice services for patients who do not qualify for hospice services, Evercare routinely re-certifies patients unqualified for hospice care after their initial 90-day period.

9. Evercare admits and has continued to admit numerous patients who were re-certified to hospice care through Evercare's Cincinnati and Dayton, Ohio offices who did not meet the criteria for hospice re-certification because they did not have a terminal illness. For each of the representative patients described above and in exhibits attached to Relator's Disclosure Statement (which is incorporated herein), Evercare submitted claims and received payment from the United States of America through Medicare for hospice services provided to each patient despite the fact that each patient did not meet the requirements for hospice re-certification.

10. The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount. With respect to the aforementioned misrepresentations and failures to comply, Evercare knowingly made false claims to officials of the United States for the purpose of obtaining compensation.

11. Upon information and belief based upon the co-Relators' knowledge of Evercare's local and corporate practices, Evercare's other facilities nationwide also follow the same practices of knowing non-compliance and false billing. Upon information and belief

based upon the co-Relators' knowledge of Evercare's local and corporate practices, Evercare's corporate offices are aware of the non-compliant practices and have not taken action to accomplish compliance which would substantially reduce corporate profits.

12. Taken together, damages from Evercare systematic practices of admitting and recertifying ineligible patients and abusing the Continuous Care designation, nationwide since 2009 when co-relators were hired, would be at least approximately $78,000,000 in false or fraudulent billing.

## PRAYER FOR RELIEF

WHEREFORE, the United States is entitled to damages from Evercare in accordance with the provisions of 31 U.S.C. §§ 3729-3733, and co-relators request that judgment be entered against Defendants, ordering that:

a. Defendant cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.;*

b. Defendant pays an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty against Defendant of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c. Co-relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

e. Co-relators be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d);

f. The United States and co-relator be granted all such other relief as the Court deems just and proper.

Respectfully submitted,

R. Scott Oswald (to be admitted pro hac vice)
David Scher (to be admitted pro hac vice)
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)

dscher@employmentlawgroup.com

Attorneys for *Qui Tam* Plaintiffs

James B. Helmer, Jr. (OSB 0002878)
Robert M. Rice (OSB 0061803)
HELMER, MARTINS, RICE &
POPHAM CO., L.P.A.
600 Vine Street, Suite 2704
Cincinnati, OH 45202
(513) 421-2400

support@fcalawfirm.com

Trial Attorneys for *Qui Tam* Plaintiffs

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, co-relators hereby demand a jury trial.

Respectfully submitted,

R. Scott Oswald (to be admitted pro hac vice)
David Scher (to be admitted pro hac vice)
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
dscher@employmentlawgroup.com

Attorneys for *Qui Tam* Plaintiffs

James B. Helmer, Jr. (OSB 0002878)
Robert M. Rice (OSB 0061803)
HELMER, MARTINS, RICE &
POPHAM CO., L.P.A.
600 Vine Street, Suite 2704
Cincinnati, OH 45202
(513) 421-2400
support@fcalawfirm.com

Trial Attorneys for *Qui Tam* Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that, in accordance with United States District Court For The Southern District Of Ohio Local Civil Rule 3.2, a copy of the foregoing has been served on the following representatives of the United States of America on November 16, 2012 as indicated:

By electronic mail:

Andrew Malek, Esq.
Assistant United States Attorney
United States Attorney's Office
303 Marconi Boulevard, Suite 200
Columbus, OH 43215
(614) 469-5715
Andrew.Malek@usdoj.gov

Donetta Wiethe, Esq.
Assistant United States Attorney
United States Attorney's Office
221 E. Fourth Street, Suite 400
Cincinnati, OH 45202
(513) 684-3711
donetta.wiethe@usdoj.gov

By Certified Mail:
Eric H. Holder, Jr., Esq.
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

James B. Helmer, Jr.